Howard *vs.* Brown, adm'r.

| 3 | 523 |
|---|---|
| f125 | 72 |
| f125 | 78 |

No. 69.—Harmon Howard, plaintiff in error *vs.* Lewis S. Brown, adm'r. of Luke J. Morgan, deceased, defendant in error.

[1.] The true test of the interest of a witness is, that he will either gain or lose by the direct and legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. It must be a *present, certain* and *vested* interest and not an interest *uncertain, remote,* or *contingent.*

[2.] If the interest be of a *doubtful* nature, the objection goes to the *credit* of the witness, and not to his *competency.*

[3.] The holder of a promissory note or other instrument, is bound to sue a *dormant* partner of the makers, not generally known as such, when notified to do so by the security or indorser, under the act of 26th December, 1831.

[4.] A judgment was recovered against the plaintiff as a subsequent indorser, and was settled by him by giving a new note and agreeing to pay the attorney's commissions upon the judgment, which was to be kept open as a lien therefor. In a suit upon the old note, by the plaintiff against a prior indorser, it was *held* that the plaintiff became the holder thereof *eo instanti* upon his settlement of the judgment, so as to be affected by notice to sue the makers, notwithstanding the attor-

ney's commissions remained unpaid and the judgment continued open to secure them.

[5.] Notice was given to the holder to sue the maker, but before the expiration of the three months allowed by the statute, the maker removed out of the State, so that no suit could be instituted against him; *held,* that the holder has the whole three months allowed by the statute, within which to sue, and that the *removal* of the maker was at the *risk* of the *indorser,* and not of the *holder.*

Assumpsit. From Wilkes Superior Court. Tried on the appeal. Before Judge Sayre. September Term, 1847.

The plaintiff on the trial in the Court below, produced in evidence the note declared on, which was for $2000 principal, dated 28th July, 1840, due by the first of January thereafter, made by Story & Pratt, payable to the order of Luke J. Morgan, defendant's intestate, and indorsed by him and the plaintiff Howard and Addison Pratt. The plaintiff also produced the record of a judgment upon said note from Bibb Superior Court, in favour of the Central Bank against him as the second indorser, and an order taken at the November adjourned term, 1843, of that Court, giving him control of the note to pursue the makers and prior indorser.

It was then proven by the testimony of Alfred M. Nisbet, cashier of the Central Bank, that the note sued on was discounted there, and finally paid by the plaintiff in December, 1842, by running a new note, and that he, in consideration of the indulgence, agreed to pay the commissions of Tracey & Gresham for collecting the same. It was also proven by the testimony of John J. Gresham, Esq., that the judgment against the plaintiff was held open by him as the active partner of Tracey & Gresham, for his fee, he holding a lien upon it for that purpose, under the settlement with the Bank. That at that time the plaintiff was hard pressed, and considered insolvent; that his fee was finally arranged to be paid by one Gates, who paid a portion in November, 1844, and the balance in 1845; that plaintiff did not have possession or control of the note until the order at the November adjourned term of Bibb Superior Court, 1843; that Story in 1841 was insolvent, and Addison Pratt dead, who as far as witness knew, were the only partners; that if the plaintiff had informed witness he wished the note in order to pursue the principals or prior indorser he would have permitted him to have it, although by his agreement he was not entitled to it.

The defence relied upon was, notice to sue the principals, first in 1843, and again after the commencement of the suit; and also

that the plaintiff was estopped by his contract of indulgence with the previous holder.

John H. Morgan was introduced as a witness on the part of the defence, and being objected to on the ground of interest, he was sworn on his *voire dire*, and stated that he was not interested; that he was a son of Luke J. Morgan, the defendant's intestate, but was not entitled to any portion of his estate; that he had been discharged as a bankrupt since the death of his father, (the said Luke J.) and his interest in his estate was included in his schedule ; that his schedule was purchased at the sale of the commissioner in bankruptcy, by one Moorehouse, his brother-in-law, for a small amount, less than five dollars, under no promise to account to him, or any expectations of witness that he would account; that Moorehouse informed witness that he announced to the bidders that he was bidding it in for witness, but did not say whether he would or not comply with the announcement. Whereupon the Court below decided that the witness was competent; to which the plaintiff excepted.

The witness then being sworn in chief, stated that he was present in the year 1843, when defendant requested the plaintiff to proceed to collect the said note out of the makers thereof; and witness as agent of the defendant, frequently afterwards required plaintiff to sue. Both the defendant and witness informed the plaintiff that Frederick Pratt was a partner. This was in Macon, near the Floyd House, in the summer. Witness afterwards, as agent, repeatedly, and before said Frederick Pratt left for the north in September or October, gave the notice to sue. Frederick Pratt returned in the spring of 1844, remained two days in Macon, went to Washington, Wilkes county, and returned to Macon, where he remained two days more. Witness did not see plaintiff while Pratt was in Macon that year. Pratt returned to the north, and had not since been in Georgia. Story left the state in 1840, and had not since returned. Witness inferred Frederick Pratt to have been a partner from the commencement of the firm, from the fact of being a clerk in the house, and from the correspondence. He (Frederick Pratt) came to Georgia late in 1840, or early in 1841, and took part immediately in the matters of the concern; his brother, Addison Pratt, died in the spring of 1841, and Frederick took possession of all the effects. He denied being a partner, but promised Howard to pay this debt out of the effects of the firm. When the note was given, the firm consisted ostensibly of Alfred

Story and Addison Pratt. When the notice was given by defendant, and by witness as his agent, the plaintiff replied, that he had not the control of the note and could not sue; and also informed witness that he, plaintiff, could not take the oath to hold Frederick Pratt to bail, because he believed the prior indorser good, and always said that he did not know Frederick Pratt to be a partner. Plaintiff, for the first time, acknowledged that he had control of the note, in January, 1844. Witness knew Frederick Pratt to be a partner, and so informed the plaintiff, and plaintiff from the information of others as well as witness, knew him (Frederick Pratt) to have been a partner from the beginning. He was not generally known as a partner in 1841; no one out of the store knew him to be a partner before that time. Witness did not know whether or not plaintiff knew that Pratt was in Georgia in 1844.

The jury, after argument of counsel and the charge of the Court below, found for the defendant.

To the charge of the Court below the counsel for the plaintiff excepted, on the following grounds: (The portions of the charge excepted to, are sufficiently set forth in the grounds of the exceptions.)

1. That the Court erred in charging the jury as to the right of the indorser to give notice to sue a dormant partner of the makers, not generally known as such.

2. That the Court erred in charging the jury that the plaintiff became the legal holder of the note so soon as he run a new note in the Central Bank, and before he had complied with the condition of paying the commissions of the attorneys, and while the judgment was still held open against him as a lien for said commissions.

3. The Court erred in charging the jury that where notice was given, if the makers removed without the limits of the State before the three months expired, it was the *risk* of the holder, and the indorser was discharged if in the exercise of ordinary diligence the holder could have sued before the maker went away.

Upon which exceptions error was assigned.

T. R. R. COBB and F. H. CONE, for the plaintiff in error.

A. H. STEPHENS and REESE, for the defendant in error.

LUMPKIN, J., having been of counsel in this case, gave no opinion.

Howard *vs.* Brown, adm'r.

*By the Court.*—WARNER, J., delivering the opinion.

The first exception taken to the decision of the Court below is, to the admission of the testimony of John H. Morgan, who was offered as a witness on the part of the defendant.

The true test of the interest of the witness is, that he will [1.] either gain or lose by the direct and legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. It must be a present, certain, and *vested* interest, and not an interest uncertain, remote, or contingent. And if the interest be of a *doubtful* nature, the objection goes [2.] to the *credit* of the witness, and not to his *competency.* 1 *Greenl. Ev.* 458, *sec.* 390. From the facts disclosed by the record, we do not think the witness had such a direct and *vested* interest in the suit as would render him incompetent. The promise made by his brother-in-law to him was a mere *nude pact,* which the law would not enforce, and therefore vested no interest in the witness; the objection was properly to the *credit* of the witness, and not to his *competency ;* and the Court below did not err in admitting his testimony.

The second exception appearing on the record is, that the [3.] Court below erred in charging the jury as to the right of an indorser to give notice to sue a dormant partner of the makers, not generally known as such. By the Act of 26th December, 1831, which was amendatory of the Act of 1826, it is declared, " That every case which may hereafter arise, where the security or indorser of any promissory note or other instrument, after the same has or shall become due, has required, or shall hereafter require, the holder thereof to proceed to collect the same, and the said holder has not proceeded, or shall not proceed to do so *within three months* after such notice or requisition, the indorser or security shall be no longer liable." *Prince* 471. The act does not in express terms declare that the holder must proceed to collect the note *by suit, out of the maker,* within three months after notice, but such, it is believed, has been the uniform and contemporaneous construction given to the act by our courts ; and the question now presented is, whether the holder, after notice, was bound to have sued a dormant partner as one of the makers, whose name did not appear on the face of the paper.

The note was drawn by Story & Pratt, and indorsed by the

defendant's intestate.   Addison Pratt and Story were the *ostensible* partners ; but the jury have found by their verdict that Frederick Pratt was also a partner ; and the holder was notified to sue him as one of the *makers* of the note.

It is contended by the plaintiff in error, that the right of the holder of the note to sue the dormant partner is merely *elective,* and not *compulsory.*   This may be true as a general rule when the rights of third persons are not to be affected by his election ; but the rights of the indorser are involved in this case ; the statute gives him the right to require the holder of the note to proceed to collect the same by suit against the makers thereof, within three months, and if he fails to do so, the indorser is no longer liable.   In *Pitts* vs. *Waugh et al.,* 4 *Mass. R.* 426, Chief Justice Parsons says : " By the law merchant, a man may be answerable as a *dormant* partner on a contract made by the partnership, of which he is in fact a member."   A dormant partner is suable as a defendant, because he participated in the profits of the contract.   *Lloyd* vs. *Archbowle,* 2 *Taunt. R.* 324.

The jury having found by their verdict the fact that Frederick Pratt *was a partner*, it follows as a necessary legal consequence, that he was one of the *makers* of the note, and as such was liable to be proceeded against by suit, at the instance of the holder, when required to do so by the indorser ; and there was no error in the charge of the Court below on this branch of the case.

[4.]   The third exception is, that the Court erred in charging the jury, that the plaintiff became the legal holder of the note so soon as he run a new note in the Central Bank, and before he had complied with the condition of paying the commissions of the attorneys, and while the judgment was still held open against him as a lien for said commissions.   It appears, from the testimony of the cashier of the Central Bank, that the judgment *was paid* at the bank by Howard's giving a new note, he agreeing to pay the attorneys who obtained the judgment their commissions for obtaining the same.   The moment the debt was paid by Howard, who was a subsequent indorser, he had the legal right to control the paper as against his prior indorser, and the makers thereof.   The new note was accepted by the bank in *satisfaction of the judgment* obtained against Howard, as the second indorser thereon.   The payment of the commissions was an act to be done by Howard according to his agreement, and was a matter of his own, and did not alter or change his rights as holder of the paper.   According

to the view taken by the plaintiff, if Howard never paid the attorneys' commissions, he never would become legally the holder of the paper, and notice to proceed to collect out of the makers, by the indorser, would never be effective, and would thus defeat the indorser's right to give him notice under the statute, by his own omission to perform his agreement. We do not think it is in the power of the plaintiff in error to avail himself of any lien which the attorneys might have had on the papers in their hands for the payment of the commissions which, by his own agreement he was bound to discharge; we therefore affirm the judgment of the Court below upon this point, as made by the bill of exceptions.

The fourth exception taken by the plaintiff in error is, that [5.] the Court below erred in charging the jury, that when notice was given, if the makers removed without the limits of the State before the three months expired, it was the risk of the holder, and the indorser was discharged if in the exercise of ordinary diligence the holder could have sued before the maker went away.

The Act of 1831 was intended accurately to define the duties and rights of both the holder and indorser. Before the enactment of this statute, the security would have been compelled either to have taken up the note from the holder, and pursued his legal remedies against the principal, or to have made application to a court of equity for relief. We are aware that a different doctrine was maintained in *Pain* vs. *Packard*, 13 *Johns. R.* 174. In that case it was decided, that where the holder of a note who was requested by the surety to proceed without delay to collect the money out of the principal, who was then solvent, neglected to do so until the principal became insolvent, the surety was exonerated.

This doctrine was full discussed and denied, both upon principle and authority, by Chancellor Kent, in *King* vs. *Baldwin*, 2 *Johns. Ch. R.* 554.

The decree of the chancellor was, however, reversed on appeal, by the Court of Errors, by the casting vote of the presiding officer of the court—two of the judges of the Supreme Court expressly overruling their own decision in *Pain* vs. *Packard*, saying that, upon more full and deliberate investigation, they were convinced that their judgment in that case was *erroneous*.

In *Warner* vs. *Beardsley*, 8 *Wend. R.* 194, the court felt itself bound by the previous adjudication of the Court of Errors sustaining the case of *Pain* vs. *Packard*, yet, the chancellor who delivered the opinion of the court, takes occasion to repudiate the principles

of that decision, and declares that it stands in opposition to the decisions of most, if not all of the States in the Union, where the question has arisen. In *Beardsley* vs. *Warner*, 6 *Wend. R.* 610, the court held, that the doctrine ruled in *Pain* vs. *Packard*, did not apply to the case of an *indorser* of a promissory note; taking a distinction between one who is a *mere surety* for another and an *indorser* of negotiable paper. The court say, "An indorser, though in the nature of a surety, is answerable upon an *independent contract*, and it is his duty to take up the bill when dishonoured. The moment the note is dishonoured, and notice of that fact duly given to the indorser, the holder's right to sue him is perfect, and this right is not impaired as long as he remains *passive*." The case of *Pain* vs. *Packard*, has not been followed by the courts of New York because it was originally based upon the *true principles of the law*, but for the reason that it has been sustained by the court of *dernier* resort in that State, and therefore considered as *binding authority there*, in all cases coming directly within that decision.

Before the passage of our statute, we do not understand the rule of law to have been that the security or indorser had the right to request the holder to proceed to collect the paper, and if he failed to do so within a *reasonable* time, and the principal became insolvent, or removed beyond the jurisdiction of the court, that the security or indorser was discharged from liability. In *King* vs. *Baldwin*, Chancellor Kent emphatically declares, "there is no case in the *English* law, in which the personal application of the surety to the creditor, was held to be compulsory on the creditor, at the hazard of discharging the surety.' See *Pickett* vs. *Laud*, 2 *Bailey R.* 608.

The surety to the note, whether a joint promissor or indorser, by the law governing the contract, stands in the same relation to the creditor in regard to the payment of it as the principal debtor, so long as the contract remains unaltered by the act of the creditor, with the acknowledged right in the security or indorser at any time after the money becomes due, to pay the debt and sue the principal, at his own risk, for indemnification. When the liability of the indorser becomes fixed by demand and notice, the holder has a perfect right to sue and collect his money out of either the maker or indorser, unless the holder has made a *new contract* with the maker *prejudicial* to the rights of the indorser, whereby he would be entitled to be discharged. *McLemore* vs. *Powell*, 12 *Wheat. R.* 554.

We think it is clearly established, both upon principle and authority, that before the enactment of our statute, the holder of the note could not have been compelled to have sued the makers at the request of the indorser; and if such a requisition had been made on the holder by the indorser, and the holder had neglected or refused to have instituted suit against the makers until they had removed beyond the jurisdiction of the State, or become insolvent, the indorser would not have been discharged, notwithstanding the holder could have instituted the suit against the makers by the exercise of ordinary diligence.   If the indorser had not the right in law to require the holder to sue the makers, then the exercise of ordinary or extraordinary diligence had nothing to do with the question.

We have endeavoured to show what were the rights of the holder of the paper to collect his money out of the indorser or security, prior to the enactment of our statute.   We have shown that the indorser was not discharged by the mere *passive* indulgence of the holder to the makers, although requested by the indorser to sue them; that the indorser by his own *mere request* could not defeat his own *legal liability* for the payment of the paper.   The statute, however, was made in *derogation* of the common law rule upon this subject, and introduced a *new principle* of commercial law.   This statute is not only in derogation of the common law rule, but it operates as a restriction upon the rights of the holder, and in our judgment ought to be *strictly* construed. The indorser now has the right to require the holder to proceed to collect the paper, and if he shall not proceed to do so *within* three months after such requisition, the indorser is no longer liable. The holders' rights during the three months are precisely the same as they were under the old law; during the three months, the indorser is bound to the holder in the same manner and just to the same extent as he was before the statute.   The release of the indorser depends entirely on the action of the holder, who has the *whole* three months given him to sue the makers.   The indorser derives his right to be released from the statute, and that gives him no relief until *after the expiration of three months*.

The legislature did not think proper to leave it to *judicial discretion*, as to what should be considered a *reasonable* time for the holder to sue, after notice, but have, with commendable wisdom expressly declared *within* what time the holder shall proceed to collect, or lose his right.

The charge of the Court below to the jury was, " that if the

makers removed without the limits of the State *before the three months expired*, it was the risk of the holder, and the indorser was discharged if in the exercise of ordinary diligence the holder could have sued before the maker went away." Suppose the makers had become *insolvent* after the notice, and before the expiration of the three months, and the holder sued them on the last day of the time allowed by the statute, at whose *risk* was the solvency or insolvency of the makers, during the three months? If the indorser was *bound* for the debt to the holder until after the expiration of the time prescribed by the statute, then the solvency of the makers was at the risk of the indorser, although the holder might, perhaps, by the exercise of ordinary diligence in instituting suit at an earlier period, have collected the debt out of the makers.

But the record declares, that in this case the holder did not sue within the three months, for the reason that, before the expiration of the time, the makers removed beyond the jurisdiction of the State, so that the holder could not sue them; and the Court below ruled that such removal was *at the risk of the holder*. This is an important question to the holders of commercial paper.

The indorser was, in our judgment, bound to the holder for the payment of the money until the expiration of the three months, and the holder had the full time allowed him by the statute to institute the suit; and if, in the mean time, the makers removed beyond the limits of the State so that they could not be sued, it was at the risk of the indorser or security *who was bound for them*, and not at the risk of the holder, who refused *to trust the makers without the security*. If, before the statute, the removal of the makers would have been at the risk of the indorser or security, and not at the risk of the holder, upon what principle is it that, during the three months while the holder's rights are as perfect as under the old law, the risk of the removal of the maker beyond the jurisdiction of the court, is shifted from the indorser or security to the holder of the note? where is the authority for declaring that the risk is so shifted? The statute does not *so declare*, nor do the principles of the commercial law, to which reference has been already made. The indorser, or security, derives no assistance from the statute for the purpose of restricting his liability to the holder, until *after the expiration of the three months;* the statute does not take from the holder any of his rights *during the three months*, which he had under the old law, nor does it dimin-

ish in the least degree during that period, the *responsibility* of the security or indorser to the holder of the note.   Nor does this view of the question impose any additional burden or hardship on the security or indorser, for he has the same right, if he wishes the makers sued at an earlier period, during the three months than the holder is willing to institute suit to take up the paper from the holder, and institute the suit himself against the makers, as he had before the passage of the statute.

If the indorser is unwilling to wait the time which the statute gives the holder to sue the makers, it is not only his right to take up the note from the holder and institute the suit himself against them, but his duty also, if he wishes to protect himself against the consequences of the removal of the makers beyond the jurisdiction of the Court *within the three months ;* for it is the *security who trusts the principal debtor ;* the holder, by requiring *security*, clearly manifests that he is unwilling to trust the *maker*, and " he who trusts most shall lose most," is stated by Lord Hardwicke to be the rule, in *Skip* vs. *Huey*, 3 *Atk. R.* 93.   Besides, there exists a practical difficulty in enforcing the rule, as stated by the Court below, that " the indorser is discharged, if, in the exercise of *ordinary diligence*, the holder could have sued before the maker went away." What is to be considered " ordinary diligence " on the part of the holder ?   Shall he be required to sue in one, three, or six weeks after the notice ?   The rights of the holders of commercial paper would, in our judgment, be subjected to great inconvenience and uncertainty with regard to their rights, when made to depend on judicial discretion and caprice as to what should be considered *ordinary diligence* in commencing suit against the maker, instead of the *definite* and fixed period prescribed by the statute.   The statute regulates the time within which the suit shall be instituted, after the notice to proceed to collect is given by the security or indorser, and we have no desire to introduce any exceptions to the uniform operation of that rule, which must necessarily be made to depend upon *judicial* discretion as to what shall constitute " ordinary diligence;" when the legislature have definitely declared the rule as to what shall constitute ordinary diligence, in commencing suit against the maker by the holder of the note, in order to discharge the security or indorser.   We are therefore of the opinion, for the reasons already stated, that the security or indorser is bound to the holder for the payment of the debt, until the expiration of the three months from the time of the notice; and if the

makers remove without the jurisdiction of the court *within that time*, so as to prevent the holder from suing them, such removal is at the risk of the security or indorser who became *bound for the makers*, and not at the risk of the holder.

Let the judgment of the Court below be reversed, and a new trial granted.

Judgment reversed.